UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| GORDON MICHAEL WAGNER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 14-178-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| THE SHERWIN-WILLIAMS COMPANY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Specialty retailers have it rough these days. Big-box stores and internet vendors can offer one-stop shopping, more-convenient ordering, and lower prices. But there is something that those competitors cannot offer: face-to-face service. It is often the only thing. To have any hope of remaining competitive in that kind of marketplace, specialty retailers need to forge strong, in-person bonds with customers. That is what Sherwin-Williams, a specialty paint retailer, tries to do. Hence it requires store managers not only to oversee store operations, but also to visit off-site locations to make deliveries, conduct sales calls, identify potential customers, and generally provide face-to-face customer service. And in rural areas like Pikeville, Kentucky, that means driving.

For many years, Gordon Wagner performed all of the functions of a store manager in Pikeville. Sadly, in 2013, Wagner had a stroke and lost his peripheral vision, making him unable to drive. When his vision loss became permanent, Sherwin-Williams decided that he could no longer perform the essential functions of his job, removed him from his position, and placed him on disability leave. Wagner then sued under the Americans with Disabilities

Act and Kentucky law, alleging that Sherwin-Williams discharged him because of his disability, failed to provide him with a reasonable accommodation, and retaliated against him for requesting one. Sherwin-Williams now moves for summary judgment on Wagner's failure-to-accommodate and wrongful-discharge claims. The company argues among other things that Wagner has failed to show a genuine issue as to whether he could perform his job's essential functions, which, according to Sherwin-Williams, included driving. Sherwin-Williams also moves for summary judgment on Wagner's retaliation claim, arguing that no reasonable jury could find that he was discharged because he requested an accommodation. For the reasons stated below, the Court agrees with both of those arguments. Sherwin-Williams is therefore entitled to summary judgment.

I.

A.

Sherwin-Williams is one of the world's largest retailers of paint, coating, and related products; it operates around 4,100 retail stores nationwide. Although all the stores operate in accordance with the company's overall business plan, they are also highly independent. Each store has its own call center, runs its own marketing operations, and is responsible for its own profit-and-loss statements. The market for paint, however, is highly competitive. Thus, "to distinguish itself," Sherwin-Williams "adds value to its brand by focusing on commercial contractors" and "strives to create personal connections with this customer base." R. 56-4 at 1–2. The company believes that "having a personal connection to the customer it serves, and in the community in which its retail paint stores operate, is the most

powerful and enduring connection to the consumer's long term loyalty and continued business." R. 56-4 at 2.

To achieve this goal, Sherwin-Williams strives to offer "more than in-store service to its customers." R. 56-3 at 2. Thus, store managers are expected to do more than supervise staff, oversee store operations, and so on. They also serve as "a highly trained professional sales force responsible for the marketing operations, profit and loss, and customer service of their stores and the geographic areas serviced by each store." R. 56-3 at 2. The managers must "deliver products and respond to customer concerns directly; travel off-site for customer service; conduct face-to-face sales meetings; [and] conduct on-the-job product demonstrations and job-site consultations." R. 56-3 at 2. The point of all this, according to Sherwin-Williams, is to "develop[] emotional connections with [the] customer base" and ultimately "differentiate [Sherwin-Williams] from its competitors." R. 56-3 at 2.

Store managers know up front that they will need to perform these duties. The store-manager job description states that managers must, among other things, "[c]onduct periodic market research studies[,] profile[] key competition in the market[,] visit competition[,] conduct competitive product testing and comparisons[,] identify strengths and weaknesses of competitors versus Sherwin-Williams[,] profile potential customers by type and estimated sales volume[,] and make outside calls to support the market development plan." R. 55-8 at 15. Store managers spend up to 20% of their work week performing these off-site duties. R. 70 at 35–48. As a result, Sherwin-Williams requires that all managers must be able to drive. Indeed, the store-manager job description states explicitly that managers must have a valid driver's license and "must be able to drive a car or van." R. 55-8 at 16.

3

One of Sherwin-Williams's stores is located in Pikeville, Kentucky, a rural area of the Commonwealth; the store there is the only Sherwin-Williams outpost within a 50-mile radius. R. 56-2 at 2. Hence it serves a large geographic area containing numerous commercial and residential customers. Like all of Sherwin-Williams's stores, the one in Pikeville is leanly staffed. In 2013, the store employed just three full-time employees—a manager, an assistant manager, and a sales associate—as well as two part-time employees. *Id.* at 3. Now the store is even leaner: it has just two managers and three part-time salespeople. R. 65-4 at 2.

B.

Gordon Wagner began working at the Pikeville store in 1993. He was hired as a sales associate, then rose through the ranks to become store manager in 1999. Wagner admits that, as manager, he understood that all his employees were "expected to have the ability to drive." R. 71 at 108–09, 207. Indeed, he never hired anyone who could not. R. 71 at 108. While Wagner was manager, he made numerous scouting runs and face-to-face sales calls. And he estimated that he spent 6 to 12 hours per week performing off-site duties. R. 66 at 75.

In February 2013, Wagner had a stroke, which caused him to lose peripheral vision in both eyes. R. 55-15 at 44. As a result, he became unable to drive. R. 55-16 at 67-68. Sherwin-Williams placed him on medical leave from March through April, paying him his full salary during that time. R. 56-2 at 8. He then returned to work with a no-driving restriction. The company's Human Resources ("H.R.") department believed that this restriction would be temporary, and that Wagner might later regain his vision and thus his

4

ability to drive. So Sherwin-Williams allowed him to remain in his job as store manager. R. 55-17 at 155–57.

Six months later, Wagner's doctor examined him and determined that his vision loss would be permanent. She also noted that he would likely never regain "legal driving vision." R. 71 at 15; R. 71-2 at 15. She placed these findings in a note, which Wagner gave to Sherwin-Williams's H.R. department. Wagner then asked the company to excuse him from driving permanently. R. 71-1 at 182–83. Sherwin Williams's H.R. managers discussed that proposed accommodation but decided that driving was an essential function of Wagner's job. R. 67 at 54-55. They also tried to brainstorm other accommodations but were unable to identify any that would not impose an undue hardship on the company. R. 67 at 14. As a result, Sherwin-Williams placed Wagner on permanent disability leave in October 2013. R. 67 at 14. The H.R. department told Wagner that he was not fired and that, if his vision improved enough to allow him to drive, he might be able to have his job back. R. 71-3 at 87.

In November 2014, Wagner sued Sherwin-Williams under the Americans with Disabilities Act and the Kentucky Civil Rights Act. R. 1-1 at 4-8; *see* 42 U.S.C. § 12101 et seq.; Ky. Rev. Stat. Ann. 344.010 et seq. Specifically, he alleged that Sherwin-Williams failed to make reasonable accommodations for his disability, discharged him because of his disability, and retaliated against him for requesting an accommodation. Sherwin-Williams now moves for summary judgment. R. 56.

## II.

Summary judgment is "put up or shut up" time. *Street v. J.C. Bradford & Co.*, 886 F.3d 1472, 1478 (6th Cir. 1989). Courts must grant summary judgment if "the record,

viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once a defendant has met its initial burden of showing that no genuine issue of material of fact remains, the plaintiff must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, he must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in his favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

**A.**

Sherwin-Williams first argues that it is entitled to summary judgment on Wagner's failure-to-accommodate and wrongful-discharge claims. To prevail on either claim, a plaintiff must show that he was "qualified" for his position, *i.e.*, that he could perform all of the "essential functions" of his job, either with or without a reasonable accommodation. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).[1] The parties here agree that Wagner could not drive even with an accommodation. The question presented, then, is whether driving is an essential function of the job of a Sherwin-Williams store manager.

To help answer that question, the ADA itself provides two factors for courts to consider: "the employer's judgment as to what functions of a job are essential," and any "written [job] description[s]." 42 U.S.C. § 12111(8). Here, three Sherwin-Williams

---

[1] The Kentucky Supreme Court uses federal case law to interpret claims brought under the Kentucky Civil Rights Act. Hence the analysis is the same for Wagner's state and federal claims. *See, e.g.*, *Brooks v. Lexington-Fayette Urban County Hous. Auth.*, 132 S.W.3d 790, 801–02 (Ky. 2004).

6

executives testified that driving was an essential function of the store manager's job. R. 56-2 at 5; R. 56-3 at 3; R. 56-4 at 3. And Sherwin-Williams's written job description states that the store manager "must be able to drive a car or van." R. 55-8 at 16. Both statutory factors therefore suggest that driving was an essential function of Wagner's job.

In addition to the statutory factors, federal regulations provide five others for courts to consider when determining whether a function is essential. Four are relevant here:[2] "the amount of time spent on the job performing the function[,] the consequences of not requiring the [employee] to perform the function[,] the work experiences of past incumbents in the job[,] [and] the current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

Each of these regulatory factors likewise suggest that driving was an essential function of Wagner's job. As for "time spent on the job performing the function," Wagner himself estimated that he drove for 6 to 12 hours each week—roughly a quarter of his time at work. R. 66 at 75. Given that Wagner spent so much of his time driving, this factor suggests that driving was an essential function.

As for the "consequences of not requiring the incumbent to perform the function," Sherwin-Williams's "competitive edge" is that it provides better face-to-face service than its competitors. The consequences of not requiring Wagner to drive would therefore be severe: Sherwin-Williams would be less competitive in the marketplace. *See, e.g.*, R. 56-4 at 3–4. This factor, too, thus suggests that driving was essential to Wagner's job.

---

[2] The fifth is the terms of a collective-bargaining agreement. But Sherwin-Williams had no such agreement with Wagner, so that factor is not relevant here.

7

As for the "work experiences of past incumbents," the only one who provided evidence in this case—Marco Cline—said in his affidavit that he believes driving is an essential function of the job. *See* R. 56-2 at 3–4. Thus, this third factor also suggests that driving was an essential function.

Finally, as for the last factor—the "work experiences of current incumbents in similar jobs"—the current Pikeville manager, Allen Harvel, testified that he drives for around one fifth of his work week, that he spends at least one full day per week on outside sales-and-marketing tasks, and that he could not perform these tasks if he could not drive. R. 55-13 at 35–48. Thus, he testified, driving is an essential function of the store manager's job. R. 55-13 at 28. Given that all six factors (two from the statute; four from the regulations) all point toward the same conclusion—that driving is an essential function—no reasonable jury could find otherwise.

A recent en banc decision of the Sixth Circuit—*E.E.O.C. v. Ford Motor*, 782 F.3d 753 (6th Cir. 2015) (en banc)—confirms this result. There, the plaintiff argued that she should be entitled to telecommute a few days per week because in-person attendance was, in her view, not an essential function of her job. Specifically, she pointed out that her employer had allowed similar employees to telecommute on occasion, that she could perform nearly all of her duties remotely, and that the job description stated that workers might be allowed to telecommute when appropriate. *Id.* at 764–65. The court nevertheless rejected that argument—relying mostly on the employer's judgment and the consequences of not requiring the plaintiff to attend work in the office—and held as a matter of law that in-person attendance was an essential function of the plaintiff's job. *Id.* at 762–63. That logic applies

8

with even greater force here, when *all* of the relevant factors—rather than merely some of them, as in *Ford Motor*—suggest that driving was essential.

Wagner responds in seven ways. First, he points out that the driving requirement appears in the physical-requirements section of the job description rather than the essential-duties section. Thus, he says, the job description fails to show that driving was an essential function of his job. But the Tenth Circuit has expressly rejected that same argument. *See Robert v. Bd. of Cnty. Comm'rs of Brown Cnty., Kans.*, 691 F.3d 1211, 1217 (10th Cir. 2012). And Wagner points to no court that has ever accepted it. Moreover, regardless of what section the driving requirement appears in, the requirement itself could not be clearer: "employees must be able to drive a car or a van." R. 55-8 at 15. Finally, the job description is just one of several factors that courts must consider. Thus, just as in *Ford Motor*, the description alone might not suffice to show as a matter of law that driving is an essential function. But all the factors, when considered together, show just that. *See Ford Motor*, 782 F.3d at 763.

Second, Wagner contends that Sherwin-Williams's employees gave "mixed" testimony as to whether driving was truly essential. Specifically, he points out that some of those employees testified that driving was not an essential function of the assistant-manager and sales-associate jobs. *See* R. 55-7 at 80–81; R. 55-13 at 30–31. Fair enough. But Wagner did not hold one of those jobs; he was a store manager. And all of Sherwin-Williams's witnesses did testify that driving was an essential function of that job. So this argument fails.

Third, Wagner points out that both he and his expert witness, Dr. Crystal, testified that driving was not an essential function of Wagner's job. *See* R. 71 at 108; R. 71-1 at 189; R. 33-8 at 9. But that kind of evidence—namely the plaintiff's own opinion and that of his paid expert—appears nowhere in the list of factors that courts should consider when deciding whether a function is essential. Indeed, "neither the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential. That's because we do not allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience." *Ford Motor*, 782 F.3d at 764. Thus, the testimony of Wagner and Dr. Crystal provides no basis on which a reasonable jury could conclude that driving was not essential.

Fourth, Wagner contends that Sherwin-Williams conceded that driving was not an essential function when it allowed him to work as a non-driving store manager while his medical tests were ongoing. The Eighth Circuit has rejected that same argument, however, holding that an employer does not concede that a function is non-essential simply because the employer allows an employee to forego performing that function temporarily. *See Rehers v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007). And Wagner points to no authority suggesting that this Court should hold otherwise here. So this argument fails.

Fifth, Wagner argues that *Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014), shows that Sherwin-Williams is not entitled to summary judgment. That case shows no such thing. There, the employer itself had provided conflicting signals as to whether driving was truly essential to the employee's job—namely that of firefighter. Specifically, the fire department had allowed other firefighters to choose not to drive at all "as a matter of choice."

*Id.* at 1034. And the department's written job description stated that firefighters "may" operate vehicles, but nowhere stated that they *must*. *Id.* at 1042–43. These facts thus undermined the fire department's assertion that driving was truly essential to the firefighter's job. Here, in contrast, Sherwin-Williams never equivocated: it required all store managers to drive and its job description stated that all store managers must be able to do so.

Sixth, Wagner points out that driving is not the "desired result" of making outside sales calls, but merely a means of accomplishing those calls. But the question before the Court is not whether the sales calls were essential as a matter of law. The question is whether driving was. And all the statutory and regulatory factors suggest that the answer to that question is yes. Moreover, the "desired result" of running a business is rarely to have employees perform their duties; the desired result is economic profit. Indeed, even outside sales calls are not truly the "desired result"; the sales themselves are. In any event, *Ford Motor* forecloses this argument. There, "in-person attendance" was hardly the "desired result" of the plaintiff's employment, but merely a means of achieving collaboration, teamwork, and so on. And yet the court held nevertheless that the plaintiff could not perform the essential duties of her job because she could not come to the workplace in person on a regular basis. *Ford Motor*, 782 F.3d at 763.

Finally, Wagner points out that the question "[w]hether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013). True enough, but "typically" does not mean always. *See e.g.*, *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 728 (6th Cir. 2000) (affirming the district court's grant of summary judgment

after holding that plaintiff failed to create a genuine issue as to whether a function was essential). And here all of the factors show that driving was essential; that means no reasonable jury could find that it was not. *See Ford Motor*, 782 F.3d at 765–66. Thus, this is the rare case in which the question whether a job function is essential is indeed suitable for resolution on a motion for summary judgment.

In sum, the only evidence that driving was not an essential function of Wagner's job is the opinion testimony of Wagner and that of his paid expert. But the statute and regulations nowhere instruct courts to consider that kind of evidence when deciding whether a job function is essential. As for the evidence that the statute and regulations *do* instruct courts to consider, all of it suggests that driving was an essential function of the store manager's job. It follows that no reasonable jury could consider that evidence and nevertheless find that driving was not an essential function. For when "an employer's judgment as to essential job functions . . . is job-related, uniformly-enforced, and consistent with business necessity," courts must hold as a matter of law that the function is essential. *Ford Motor*, 782 F.3d at 765–66 (internal quotation marks omitted). Sherwin-Williams's judgment here—that driving was essential—was indeed job-related, uniformly enforced, and consistent with business necessity. Thus, as a matter of law, driving was an essential function of Wagner's position. And because Wagner admits that he could not drive at all— accommodation or no accommodation—it follows that no reasonable jury could find that Wagner met his burden to show that he was "qualified" for his position. Thus, his failure-to-accommodate and wrongful-discharge claims both fail as a matter of law. *See Ford Motor*

*Co.*, 782 F.3d at 766. Sherwin-Williams is therefore entitled to summary judgment on those claims.

B.

Sherwin-Williams also argues that it is entitled to summary judgment on Wagner's retaliation claim. To analyze such claims, courts "use the familiar *McDonnell-Douglas* burden-shifting framework." *Ford Motor*, 782 F.3d at 767. The plaintiff must first show a prima-facie case of retaliation. If he is able to do so, then the defendant must articulate a nondiscriminatory reason for its action. If the defendant does so, then the plaintiff must "prove that the given reason is pretext for retaliation." *Ford Motor*, 782 F.3d at 767.

For these purposes, the Court will assume that Wagner has shown a prima-facie case. Sherwin-Williams responds that it discharged Wagner because he could not perform the essential elements of his job. That is a nondiscriminatory reason. To prevail on his retaliation claim, then, Wagner must show pretext, *i.e.*, he must prove that Sherwin-Williams in fact fired him because he requested an accommodation. *See Ford Motor*, 782 F.3d at 767. At the summary-judgment stage, the question is simply whether Wagner has presented enough evidence to allow a reasonable jury to find that. *See Ford Motor*, 782 F.3d at 770.

Wagner identifies two pieces of evidence that he says are enough. First, he points out that one of Sherwin-Williams's employees, Marco Cline, suggested in his deposition that Sherwin-Williams fired Wagner in part because it feared that his disability made him a "liability" and a "safety issue." R. 55-11 at 78. Thus, Wagner says, Cline's testimony shows that Sherwin-Williams's "real motivation for placing [him] on disability leave was . . . unfounded fear based on generalizations about a disability." R. 74 at 44 (amended response).

As an initial matter, it is not at all clear what Cline meant when he said that Wagner would be a "liability" and a "safety issue." At some points in his deposition, Cline seemed to suggest that the "safety issue" raised by allowing Wagner to remain as store manager was really a security issue. Since Wagner could not drive, Cline seemed to suggest, some non-employee might have to drive Wagner to the bank to make deposits, which might raise security questions in the event that some of the money went missing. *See* R. 55-11 at 69 ("[W]e want to make sure [that] if for whatever reason there is any discrepancy in the deposit . . . that it's a Sherwin-Williams employee [who made the deposit]."). At other points, Cline seemed to suggest instead that the "safety issue" was a true safety issue: that some non-employee might have to drive Wagner around, thus perhaps leading to a car accident for which the company might be liable. *See* R. 55-11 at 68 ("Q: What do you mean 'employee safety?' A: As far as if, you know, an accident, robbery . . . any of that stuff [occurred]."). So it is hard to know exactly what Cline's testimony about Wagner being a "liability" or "safety issue" shows. What it most certainly does not show, however, is that Sherwin-Williams discharged Wagner because of "unfounded fear based on generalizations about a disability." R. 74 at 44 (amended response).

More to the point, though, even if Cline's testimony *did* show that Sherwin-Williams discharged Wagner because of an unfounded fear about his disability, Cline's testimony would still provide no support for a retaliation claim. For as Wagner himself admits, to avoid summary judgment, he needed to "present evidence from which a reasonable jury could find that Sherwin-Williams would not have fired him if he had not requested a permanent accommodation for his driving restriction." R. 74 at 44 (response). Even if the

14

Court accepted Wagner's characterization of Cline's testimony, then, that testimony suggests at most that Sherwin-Williams fired Wagner because of his disability—not because he requested an accommodation for that disability. Hence Cline's testimony in no way suggests that Sherwin-Williams would not have discharged Wagner if only he had not requested that accommodation. It therefore provides no basis for a reasonable jury to find in Wagner's favor on his retaliation claim.

Second, Wagner points to undisputed testimony that he was fired soon after he requested an accommodation. Thus, Wagner argues, the timing in this case suggests—*post hoc ergo propter hoc*, perhaps—that Wagner's request motivated Sherwin-Williams's action. But the law on this point is gin-clear: temporal proximity alone is simply not enough to allow a reasonable jury to infer pretext. *Ford Motor*, 782 F.3d at 767; *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). And here that is all Wagner has.

At the end of the day, the question at the pretext stage is as follows: why did the employer take action against the employee? Sherwin-Williams asserts that it did so because Wagner could not perform the essential elements of the store-manager job. And the company offers voluminous evidence in support of that story. In response, Wagner asserts that Sherwin-Williams did so because he asked the company to excuse him permanently from driving. But the only evidence that supports his story is the fact that Sherwin-Williams discharged him soon after he made that request. And that fact alone is not enough to allow a reasonable jury to infer pretext. Thus, no reasonable jury could find that Sherwin-Williams really discharged Wagner because he asked for an accommodation. Sherwin-Williams is therefore entitled to summary judgment on Wagner's retaliation claim as well.

## CONCLUSION

Accordingly, for the reasons provided above, it is **ORDERED** that:

(1)   Defendant Sherwin-Williams's motion for summary judgment, R. 56, is **GRANTED**.

(2)   All pending deadlines and hearings are **CANCELLED**.

(3)   The Clerk of the Court shall strike this case from the Court's active docket.

(4)   All other pending motions are **DENIED** as **MOOT**.

(5)   A separate judgment will issue.

This the 2nd day of September, 2015.

Signed By:
*Amul R. Thapar* AT
United States District Judge